

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-17-2009

# USA v. Tomko

Precedential or Non-Precedential: Precedential

Docket No. 05-4997

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Tomko" (2009). *2009 Decisions*. Paper 1436.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1436

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 05-4997

---

UNITED STATES OF AMERICA,
Appellant

v.

WILLIAM TOMKO

---

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 04-cr-00108)
District Judge: Honorable Gary L. Lancaster

---

Argued on October 24, 2006
Opinion Issued on August 20, 2007
Opinion Amended on August 21, 2007
Opinion Vacated and Petition for Panel Rehearing Granted
on January 17, 2008
Rehearing En Banc Ordered on August 19, 2008
Argued En Banc on November 19, 2008

1

Before: SCIRICA, *Chief Judge*, SLOVITER, MCKEE,
RENDELL, BARRY, AMBRO, FUENTES, SMITH,
FISHER, CHAGARES, JORDAN, HARDIMAN and
COWEN, *Circuit Judges*.

(Filed: April 17, 2009)

Nathan J. Hochman (Argued)
Alan Hechtkopf
S. Robert Lyons
United States Department of Justice
Tax Division
950 Pennsylvania Ave., N.W.
P.O. Box 502
Washington, DC  20044
        *Attorneys for Appellant*

J. Alan Johnson (Argued)
Cynthia R. Eddy
Johnson & Eddy
707 Grant Street
1720 Gulf Tower
Pittsburgh, PA  15219
        *Attorneys for Appellee*

Ellen C. Brotman
123 South Broad Street
24th Floor
Philadelphia, PA 19109

Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003
    *Attorneys for Amicus,*
    *National Association of Criminal Defense Lawyers*

Lisa B. Freeland
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222
    *Attorney for Amicus,*
    *Federal Public and Community Defenders of the*
    *Third Circuit*

-----

OPINION

-----

SMITH, *Circuit Judge*, with whom McKEE, BARRY, AMBRO, FUENTES, CHAGARES, JORDAN, and HARDIMAN, *Circuit Judges*, join.

The Government appeals the reasonableness of William Tomko's below-Guidelines sentence of probation, community service, restitution, and fine for his tax evasion conviction. If any one of a significant number of the members of this Court—including some in today's majority—had been sitting as the District Judge, Tomko would have been sentenced to some

time in prison. But "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). *Gall* reminds us that "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id*. (internal quotations and citations omitted); *see also United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (we afford "deference to the District Court because it is in the best position to determine the appropriate sentence in light of the particular circumstances of the case." (internal quotations and citation omitted)). This reality is why, post-*Booker*, "the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." *Gall*, 128 S. Ct. at 594. Where, as here, a district court decides to vary from the Guidelines' recommendations, we "must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id*. at 597. These principles require us to affirm Tomko's sentence.

I.

On May 11, 2004, Tomko pleaded guilty to a one-count information charging him with tax evasion in violation of 26 U.S.C. § 7201. Tomko was the owner and Chief Executive

Officer of W.G. Tomko & Son, Inc. ("Tomko, Inc."), a plumbing contractor. From 1995 to 1998, Tomko directed numerous subcontractors, who were building his multimillion dollar home in Washington County, Pennsylvania, to falsify information on billing invoices so that the invoices would show work being done at one of Tomko, Inc.'s many job sites instead of at Tomko's home. As a result, Tomko, Inc. paid for the construction of Tomko's home and illegally deducted those payments as business expenses. Tomko also did not properly report those payments as income on his personal tax return.[1] All told, Tomko's tax evasion scheme involved twelve different subcontractors and his general contractor, and resulted in a tax deficiency of $228,557.

The United States District Court for the Western District of Pennsylvania conducted Tomko's sentencing hearing on September 30, 2005. Using the 1997 edition of the United States Sentencing Guidelines Manual, the District Court calculated Tomko's total offense level to be thirteen and his criminal history category to be I.[2] Based on these calculations,

---

[1] As a Subchapter S Corporation, Tomko had to report all of Tomko, Inc.'s income and losses on his personal income tax return because the company was not subject to income taxation.

[2] Tomko had one prior criminal conviction: in 2001, he pleaded guilty in Maryland state court to operating a boat while intoxicated. He was sentenced to one year of probation, and he

the Guidelines recommended a range of imprisonment between twelve and eighteen months and a fine between $3,000 and $30,000.

Tomko, however, proposed that in light of the then-recent Hurricane Katrina catastrophe and his construction expertise, the Court should sentence him to probation and home detention, and require him to work for Habitat for Humanity. The Executive Director for Habitat for Humanity's Pittsburgh affiliate testified that the organization would appreciate Tomko's help in its efforts to rebuild the Gulf Coast and that Tomko had performed well in past projects, including providing onsite assistance and advice.

Tomko also proffered testimony from Tomko, Inc.'s Chief Financial Officer that the company was in danger of losing its line of credit if he were imprisoned. If this happened, Tomko, Inc. would be in dire straits financially and the jobs of its 300-plus employees would be threatened.

Finally, Tomko submitted a Motion for Downward Departure.[3] The motion argued that Tomko should be sentenced

completed twenty hours of community service.

[3]As a matter of terminology, we now speak in terms of sentencing departures, which are based on specific Guidelines provisions, and sentencing variances, which are based on the §

6

below his Guidelines range because 1) his incarceration could cause Tomko, Inc.'s innocent employees to lose their jobs; 2) he has performed exceptional charitable acts and good works; 3) he has demonstrated an extraordinary degree of acceptance of responsibility; and 4) a combination of these three factors. As exhibits, Tomko attached over fifty letters from family, friends, community leaders, and others attesting to his pre-indictment charitable activities and other good works.

After hearing these arguments and stating that it had reviewed all the motions and briefs that the parties submitted, the District Court stated its Guidelines calculations for the record and considered the sentencing factors listed in 18 U.S.C. § 3553(a):[4]

---

3553(a) factors. *United States v. Vampire Nation*, 451 F.3d 189, 195 n.2 (3d Cir. 2006).

[4]In accordance with 18 U.S.C. § 3553(a), a sentencing court must consider the following factors:

 (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

 (2) the need for the sentence imposed—
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to

I am to consider first the nature and circumstances of the offense, which are as follows.

The offense was not violent in nature.

The offense was not ongoing in nature.

---

criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(5)    any pertinent policy statement . . .

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

The offense was not part of a larger pattern of criminal activity.

There are also no identifiable victims of the offense.

I am also to consider the history and characteristics of the Defendant. [The District Court here discussed Tomko's childhood, family, education, drinking problem, and prior criminal conviction for operating a boat while intoxicated.]

I am also going to consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the rule of law, and provide just punishment for the offense. Here, the Defendant has pled guilty to tax evasion, which is a serious offense.

I am to afford adequate deterrence to the Defendant's criminal conduct. Here, the Defendant has one prior criminal incident which is alcohol-related, but has otherwise led a crime-free life.

I am to protect the public from further crimes of this Defendant. Here, the Defendant has not been involved in other crimes even though this is a serious offense here. The likelihood of recidivism in this case I find is very little.

And to provide Defendant with needed educational/vocational training, medical care, or other correctional treatment in the most effective manner possible.

I am also to consider the kind of sentences available, including federal prison, house arrest, probation, and fines, which I am going to do.

I am to consider the need [to avoid] unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct. These considerations generally weigh in favor of sentencing a Defendant within the guideline range. However, this need to avoid unwarranted sentence disparities among Defendants with similar records also gives me enough leniency, though, to understand that there are differences and those differences have to be taken into account. I recognize the need for consistent sentencing; however, in this case, given the Defendant's lack of any significant criminal history, his involvement in exceptional charitable work and community activity, and his acceptance of responsibility, we find that a sentence that is mitigated by the factors of 3553 [is] warranted.

In response, the Government insisted that the Court

10

impose a sentence that included a term of imprisonment. The Government did not challenge Tomko's factual assertions or submissions. Instead, it juxtaposed his criminal conduct with the patriotism of American soldiers fighting wars abroad and argued that greed, not community service and philanthropy, defined Tomko's character. It focused on the fact that Tomko coerced his subcontractors to file false documentation, and highlighted the "gilded cage" nature of a sentence of home detention. The Government claimed that it would be "absurd" to sentence Tomko to live in the same multimillion dollar mansion that the illegally obtained tax monies helped fund. According to the Government, the Court's failure to incarcerate Tomko would send a message that a rich defendant can buy his way out of prison, and would compromise the general deterrent effect that tax laws have on potential tax cheats.

Despite the Government's arguments, the District Court did not sentence Tomko to a term of imprisonment. Instead, the Court sentenced Tomko to three years of probation (the first of which would be served as home detention), participation in an alcohol treatment program, 250 hours of community service, full restitution, and the statutory maximum fine of $250,000. The Court explained its sentence with the following colloquy:

The reason for the sentence is as follows: Defendant stands before us for sentencing after pleading guilty to tax evasion. A review of Defendant's financial condition paints a picture of

11

a very wealthy man who had the means and wherewithal to easily pay whatever tax obligation is owing. He was a successful businessman earning a significant salary. There is simply no reason for him to have done this.

This being said, I also note his negligible criminal history, his record of employment, his support for and ties in the community, and the extensive charitable work he has done. I have also—therefore, I have sentenced him to the period of probation, which I recognize is below the guideline range. I also recognize that the fine is above the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence.

Therefore, I've done this mitigation of the sentence under the provisions set forth in 18 U.S.C. [§] 3553 for the reasons I stated. Taking all these factors into account, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation. The Court views that this sentence will address the sentencing goals of punishment, deterrence and rehabilitation.

The Government filed a timely appeal.[5]

II.

A.

Before the implementation of a Guidelines-based sentencing system in 1984, "[s]tatutes specified the penalties for crimes but nearly always gave the sentencing judge wide discretion to decide whether the offender should be incarcerated and for how long, whether he should be fined and how much, and whether some lesser restraint, such as probation, should be imposed instead of imprisonment or fine." *Mistretta v. United States*, 488 U.S. 361, 363 (1989). Reviewing courts, in turn, recognized "that the sentencing judge 'sees more and senses more' than the appellate court; thus, the judge enjoyed the 'superiority of his nether position,' for that court's determination as to what sentence was appropriate met with virtually unconditional deference on appeal." *Id.* at 364 (quoting Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L. Rev. 635, 663 (1971)). According to the Supreme Court, appellate review "beg[an] with the general proposition that once it is determined that a sentence is within the limitations set forth in the statute under which it is

---

[5]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction to review the Government's appeal under 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291.

imposed, appellate review is at an end." *Dorszynski v. United States*, 418 U.S. 424, 431 (1974)*.*

Concerns over sentencing disparities and the continued viability of rehabilitation as a penological objective dogged this sentencing system. *Mistretta*, 488 U.S. at 365. As a result, in 1984, Congress passed the Sentencing Reform Act which, among other things, established mandatory sentencing guidelines. *Id*. at 365–67. This Act, however, "did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion." *Williams v. United States*, 503 U.S. 193, 205 (1992). As the Supreme Court explained in *Williams*, "[t]he development of the guideline sentencing regime has not changed our view that, except to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.'" *Id*. (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.16 (1983)).

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court concluded that the Sentencing Guidelines could only be advisory, *id*. at 245, and instructed courts of appeals to review the sentencing court's "broad discretion in imposing a sentence within a statutory range," *id*. at 233, for "unreasonableness," *id*. at 260–61. Subsequently, *Gall* made it plain that we assess unreasonableness under the abuse-of-discretion standard. 128 S. Ct. at 591.

14

B.

As the Court mentioned in *Gall*, the abuse-of-discretion standard is "familiar" to us. *See id*. at 594. In the evidentiary context, the "[a]dmission of evidence is an abuse of discretion if the district court's action was arbitrary, fanciful or clearly unreasonable," and "[w]e will not disturb a trial court's exercise of discretion unless no reasonable person would adopt the district court's view." *United States v. Frazier*, 469 F.3d 85, 87–88 (3d Cir. 2006) (internal quotations and citations omitted). We also review a district court's decisions concerning jury instructions for an abuse of discretion, and "will order a new trial on account of a district court's refusal to give a proposed jury instruction only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." *United States v. Hoffecker*, 530 F.3d 137, 167 (3d Cir. 2008) (internal quotations and citations omitted). Attorney's fee awards are likewise reviewed for an abuse of discretion, "which can occur if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 299 (3d Cir. 2005) (internal quotations and citations omitted).

Two basic principles underlie the application of the abuse-of-discretion standard. First, "deferential review is used

15

when the matter under review was decided by someone who is thought to have a better vantage point than we on the Court of Appeals to assess the matter." *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004). Accordingly, the Supreme Court has applied the abuse-of-discretion standard where it "noted that deference was owed to the 'judicial actor . . . better positioned than another to decide the issue in question.'" *Koon v. United States*, 518 U.S. 81, 98, 99 (1996) (quoting *Pierce v. Underwood*, 487 U.S. 552, 559–60 (1988)); *see also Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 401–05 (1990) (reviewing Rule 11 sanctions for an abuse of discretion because "the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11"); *Pierce*, 487 U.S. at 559–63 (holding that attorney's fee awards under the Equal Access to Justice Act should be reviewed for an abuse of discretion). As one leading commentator has put it, "[i]n the dialogue between the appellate judges and the trial judge, the former often would seem to be saying: 'You were there. We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial. Therefore, we defer to you.'" Rosenberg, *supra*, at 663.

Second, courts of appeals apply the abuse-of-discretion standard to fact-bound issues that are ill-suited for appellate rule-making. As the Supreme Court explained in *Pierce*:

16

One of the 'good' reasons for conferring discretion on the trial judge is the sheer impracticability of formulating a rule of decision for the matter in issue. Many questions that arise in litigation are not amenable to regulation by rule because they involve multifarious, fleeting, special, narrow facts that utterly resist generalization—at least, for the time being.

487 U.S. at 561–62 (quoting Rosenberg, *supra*, at 662); *see also Cooter & Gell*, 496 U.S. at 405 ("'Fact-bound resolutions cannot be made uniform through appellate review, de novo or otherwise.'" (quoting *Mars Steel Corp. v. Cont'l Bank N.A.*, 880 F.2d 928, 936 (7th Cir. 1989))).

Pre-*Booker*, these two basic principles motivated the Supreme Court to hold that the abuse-of-discretion standard should be used to evaluate sentencing departures under the mandatory Guidelines system. *See Koon*, 518 U.S. at 98–100.[6] In *Koon*, the Supreme Court noted that "[a] district court's decision to depart from the [mandatory] Guidelines . . . will in most cases be due substantial deference, for it embodies the

---

[6]In 2003, Congress amended 18 U.S.C. § 3742(e) to give courts of appeals the authority to review Guidelines departures *de novo*. *United States v. Parker*, 462 F.3d 273, 278 n.6 (3d Cir. 2006). In *Booker*, the Supreme Court excised that portion of § 3742(e), and replaced it with the abuse-of-discretion standard. 543 U.S. at 259–62.

17

traditional exercise of discretion by a sentencing court." *Id*. at 98. The Court pointed out that determining whether a departure was permitted required "the district court [to] make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Id*. Additionally, "a district court's departure decision involves 'the consideration of unique factors that are little susceptible . . . of useful generalization,' and as a consequence, *de novo* review is 'unlikely to establish clear guidelines for lower courts.'" *Id*. at 99 (quoting *Cooter & Gell*, 496 U.S. at 404, 405)). As a result, the Court concluded that "[t]he appellate court should not review the departure decision *de novo*, but instead should ask whether the sentencing court abused its discretion." *Id*. at 91.

Post-*Booker*, the sentencing court's superior vantage point has been the oft-cited reason for applying the abuse-of-discretion standard to sentencing review. In *Gall*, the Court emphasized that "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." 128 S. Ct. at 597 (internal quotations and citations omitted). This means that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [Sentencing] Commission or the appeals court." *Id*. at 597–98 (quoting *Rita v. United States*, 127 S. Ct. 2456,

18

2469 (2007)). Additionally, "district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines sentences than appellate courts do." *Id*. at 598 (internal quotations and citation omitted). For example, "[d]istrict judges sentence, on average, 117 defendants every year . . . [whereas] [o]nly a relatively small fraction of these defendants appeal their sentence on reasonableness grounds." *Id*. at 598 n.7 (citations omitted). Accordingly, "[o]ur responsibility on appellate review of a criminal sentence is limited yet important: we are to ensure that a substantively reasonable sentence has been imposed in a procedurally fair way." *United States v. Levinson*, 543 F.3d 190, 195 (3d Cir. 2008).[7]

## C.

In the wake of *Booker*, it is essential that district courts make an "individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 597. In doing so, it is equally important that district courts provide courts of appeals with an

---

[7]Although the Supreme Court did not mention it as a rationale for applying the abuse-of-discretion standard to the current sentencing system, we recognize that sentencing decisions have become no less fact-bound than before. Sentencing still requires district courts to "resolve questions involving 'multifarious, fleeting, special, narrow facts that utterly resist generalization.'" *Koon*, 518 U.S. at 99 (quoting *Cooter & Gell*, 496 U.S. at 404).

19

explanation "sufficient for us to see that the particular circumstances of the case have been given meaningful consideration within the parameters of § 3553(a)." *Levinson*, 543 F.3d at 196. We also must have "sufficient justifications on the record to support the sentencing conclusions." *Id.* Although we can articulate no uniform threshold for sufficiency because of the fact-bound nature of each sentencing decision, we certainly always demand more than a rote recitation of the § 3553(a) factors if "at sentencing either defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). Only then will we have enough to conduct our "limited yet important" review. *Levinson*, 543 F.3d at 195.

District courts must provide their explanations and justifications while going through three steps at sentencing. As we outlined in *Levinson*:

> A district court must begin the process by first calculating the applicable Guidelines range. After that initial calculation, the court must then rule on any motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation. Finally, after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose,

which may vary from the sentencing range called for by the Guidelines.

*Id*. at 194–95. "Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 127 S. Ct. at 2465.

Our appellate review proceeds in two stages. It begins by "ensur[ing] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *Gall*, 128 S. Ct. at 597. We do not presume that a district court considered the factors solely because the sentence falls within the Guidelines range. *Cooper*, 437 F.3d at 329–30. If a district court's procedure passes muster, "we then, at stage two, consider its substantive reasonableness." *Levinson*, 543 F.3d at 195. Our substantive review requires us not to focus on one or two factors, but on the totality of the circumstances. *Gall*, 128 S. Ct. at 597; *United States v. Howe*, 543 F.3d 128, 137 (3d Cir. 2008). Indeed, we cannot presume that a sentence is unreasonable simply because it falls outside the advisory Guidelines range. *Gall*, 128 S. Ct. at 597. At both stages of our review, the party challenging the sentence has the burden of

21

demonstrating unreasonableness. *Cooper*, 437 F.3d at 332.

The abuse-of-discretion standard applies to both our procedural and substantive reasonableness inquiries. *Gall*, 128 S. Ct. 597; *United States v. Wise*, 515 F.3d 207, 217–18 (3d Cir. 2008). For example, an abuse of discretion has occurred if a district court based its decision on a clearly erroneous factual conclusion or an erroneous legal conclusion. *Wise*, 515 F.3d at 217. This also means that, absent any significant procedural error, we must "give due deference to the district court's determination that the § 3553(a) factors, on a whole," justify the sentence. *Gall*, 128 S. Ct. at 597; *see also United States v. Bungar*, 478 F.3d 540, 543 (3d Cir. 2007) (stating that, as an appellate court, we are "highly deferential" to the sentencing court's application of the § 3553(a) factors). In other words, if the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided.

Ultimately, "[t]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Grier*, 475 F.3d 556, 571 (3d Cir. 2007) (en banc); *see also Cooper*, 437 F.3d at 330 ("[W]hat we must decide is whether the district judge imposed the sentence he or she did for reasons that are logical and consistent with the factors set forth in section 3553(a)." (internal quotations and

22

citation omitted)). "An estimation of the outer bounds of what is 'reasonable' under a given set of circumstances may not always be beyond debate, but the abuse-of-discretion standard by which that estimation must be judged limits the debate and gives district courts broad latitude in sentencing." *Levinson*, 543 F.3d at 195.

III.

The Government makes only one claim of procedural error: it argues that the District Court failed to meaningfully consider general deterrence. Based on our review of the record, we cannot agree. A sentencing court does not have to "discuss and make findings as to each of the § 3553(a) factors if the *record* makes clear the court took the factors into account in sentencing." *Cooper*, 437 F.3d at 329 (emphasis added); *see also Rita*, 127 S. Ct. at 2469 (noting that "context and the record make clear that this, or similar, reasoning, underlies the judge's conclusion"). Here, "[t]he record makes clear that the sentencing judge listened to each argument," *Rita*, 127 S. Ct. at 2469, and rejected the ones the Government made concerning general deterrence. At the sentencing proceeding, the Government exhaustively asserted, directly in front of the District Court, that a probationary sentence would adversely affect general deterrence:

> A lengthy term of incarceration is also
> important for something you didn't mention in

23

what you just went through, and that's third party deterrence, particularly in this industry. In this case, if this case is any indication, this contracting industry is riddled, riddled with tax fraud. A sentence of probation tells this industry: Go ahead, cheat on your taxes. If you get caught, you'll have to pay some money, but you won't have to go to prison. You won't have to go to jail.

Our tax system, Your Honor, is dependent on the honesty of our citizenry, and a lengthy term of incarceration for this tax cheat validates that system. A sentence of probation invalidates that system. We need to [deter] this type of crime, Your Honor; and the threat of jail is real for these white collar criminals that commit tax fraud.

What we need to do is make good on that threat. That threat, if it simply isn't followed through on, is just a threat. It's not real deterrence. Real deterrence is jail. That's what makes people like Mr. Tomko think before they sign that bogus tax return, before they cheat on their taxes. They see it in the paper: Tax cheats go to jail. Maybe they'll think next time they sign that tax return.

Almost immediately *after* the Government made these statements, the District Court sentenced Tomko. The District

24

Judge noted that he viewed Tomko's sentence as "address[ing] the sentencing goals of punishment, *deterrence* and rehabilitation." (Emphasis added.) This demonstrates that the District Court heard the Government's impassioned plea, considered general deterrence, and handed down Tomko's sentence.[8] Therefore, we conclude that the District Court did not commit any procedural error at Tomko's sentencing. *See Rita*, 127 S. Ct. at 2468 ("In our view, given the straightforward, conceptually simple arguments before the judge, the judge's statement of reasons here, though brief, was legally sufficient.").

IV.

The crux of the Government's appeal is its claim that Tomko's sentence is substantively unreasonable. At oral argument, the Government reaffirmed that it would not be

---

[8]The District Court also stated that "I have sentenced him to the period of probation, which I recognize is below the guideline range. I also recognize that the fine is above the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence. Therefore, I've done this mitigation of the sentence under the provisions set forth in 18 U.S.C. § 3553 for the reasons I stated. *Taking all these factors into account*, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation." (Emphasis added.)

satisfied even if the District Court corrected the alleged procedural error on remand, but imposed the same sentence. In the Government's view, Tomko's sentence is substantively unreasonable because 1) detention in the house that Tomko partially funded with the illegal tax proceeds is plainly unreasonable, 2) this is a mine-run tax evasion case undeserving of such a lenient sentence, and 3) the statutory maximum fine cannot cure the claimed substantive deficiencies.

We reject the Government's first and third arguments with limited discussion. Concerning the first, the Government has narrowed its objections to too fine a point by focusing its objections solely on the location of Tomko's home detention. The Government admitted at oral argument that had the District Court sentenced Tomko to serve his detention in a different house—for example, as the Government suggested, "one of those Habitat for Humanity buildings that he was building in New Orleans could do," (Tr. of Oral Argument 23)—it may not have appealed. Although we agree with the Government that the sort of "gilded cage" confinement imposed here has a certain unseemliness to it, we do not believe that this condition of sentence, by itself, constitutes an abuse of discretion. Whether detention in a particular home is appropriate punishment is precisely the type of fact-bound inquiry that a sentencing court is better suited to make. Even the Guidelines leave this determination to the sound discretion of the sentencing court. *See* U.S. Sentencing Guidelines Manual § 5F1.2 cmt. 3 (1997) ("The defendant's place of residence, for purposes of home

detention, need not be the place where the defendant previously resided. *It may be any place of residence*, so long as the owner of the residence . . . agrees to any conditions that may be imposed by the court . . . ." (emphasis added)). We are in no position to second-guess that decision here.

The Government's third claim rests on a perceived link between the District Court's variance to a probationary sentence and its imposition of the statutory maximum fine. According to the Government, the District Court permitted Tomko to buy his way out of prison. This is not simply an overly-pejorative characterization of the sentence; it is a misreading of the record that is unfair to the District Court. Indeed, the record exhibits no connection between the fine imposed and the failure to incarcerate. To the contrary, the District Court explicitly stated that the two served unrelated purposes. On the one hand, probation was warranted because of Tomko's negligible criminal history, his record of employment, his community ties, and his extensive charitable works. On the other hand, the statutory maximum fine was necessary to effect deterrence in light of Tomko's wealth. We cannot conclude that the District Court abused its discretion where there exists nothing more than an implication of impropriety arising out of simple coincidence.

The Government's final argument—that this is an overly lenient sentence in a mine-run case—deserves more attention. At the outset, we address the Government's characterization of this case as a "mine-run" case. To the extent that the typicality

27

or uniqueness of a case is relevant, the Supreme Court has made clear that it does not alter our deferential standard of review when evaluating a district court's sentencing determination. To that end, the Court observed in *Gall* that:

> [i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue. The uniqueness of the individual case, however, does not change the deferential abuse-of-discretion standard of review that applies to all sentencing decisions.

128 S. Ct. at 598 (internal quotation omitted). Such deference acknowledges the district court's "institutional advantage over appellate courts," *id.* at 598, or what the Court in *Gall* labeled the "[p]ractical considerations," *id.* at 597. Accordingly, we must apply the abuse-of-discretion standard uniformly, regardless of whether a particular case appears to be a "mine-run" case on appeal.

The Government points out that "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails to properly reflect § 3553(a) considerations even in a mine-run case." *Kimbrough v. United States*, 128 S. Ct. 558, 575 (2007)

(internal quotations and citation omitted). This case, however, is different from those like *Kimbrough*, which involved the "district court's authority to vary from the . . . Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (per curiam). Here, the District Court did not vary from the Guidelines range "solely" based on a disagreement with its ability to properly reflect § 3553(a) considerations. *Kimbrough*, 128 S. Ct. at 575. Instead, the Court made an individualized determination that the Guidelines range recommended an excessive sentence in this instance. As a result, we are not reviewing "an 'inside the heartland' departure (which is necessarily based on a policy disagreement with the Guidelines and necessarily disagrees on a 'categorical basis') [that] may be entitled to less respect" in this case. *Spears*, 129 S. Ct. at 843.[9]

In essence, the Government is asking this Court to apply the already-rejected "proportionality test" by a different name. The Government's appeal boils down to a claim that Tomko's criminal history, employment record, community ties, and charitable works do not differentiate him enough from the "mine-run" tax evasion case to justify his below-Guidelines

---

[9]We see no need in this case to elaborate further on what the "closer review" and "less respect" mentioned in *Kimbrough* and *Spears* might entail.

29

sentence. Similarly, a "proportionality test" rests on "the proposition that the strength of the justification needed to sustain an outside-Guidelines sentence varies in proportion to the degree of the variance." *Rita*, 127 S. Ct. at 2467. As applied by some courts of appeals, this meant that "a sentence that constitute[d] a substantial variance from the Guidelines [had to] be justified by extraordinary circumstances." *Gall*, 128 S. Ct. at 591. In *Gall*, the Supreme Court explicitly barred the application of such an approach because it necessarily applies a "heightened standard of review to sentences outside the Guidelines range." *Id*. at 596. That, of course, is "inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions—whether inside or outside the Guidelines range." *Id.*

To be sure, "we may look for a more complete explanation to support a sentence that varies from the Guidelines than we will look for when reviewing a sentence that falls within a properly calculated Guidelines range." *Levinson*, 543 F.3d at 197. We may also properly consider "the extent of any variance from the Guidelines range." *Gall*, 128 S. Ct. at 597. As the Supreme Court has explained, "it [is] uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id*. This does not mean, however, that we elevate our review of any variance and its accompanying explanation or justification beyond the abuse-of-discretion standard. The Supreme Court has unequivocally stated that "courts of appeals must review all

30

sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *Id* at 591. We must remain faithful to that clear instruction.

Based on our review of the record, we conclude that the District Court did not abuse its discretion here. At Tomko's sentencing hearing, the District Court explicitly examined subsections (a)(1), (a)(2)(A), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(3), (a)(4), and (a)(6) of § 3553. The District Court also ordered full restitution. *See* 18 U.S.C. § 3553(a)(7). After hearing argument from the Government concerning the need for a term of imprisonment, the Court reiterated its reasons for imposing a sentence without one. The District Court gave specific reasons for why Tomko's sentence varies from the Guidelines range. This variance took into account his negligible criminal history, his employment record, his community ties, and his extensive charitable works as reasons for not incarcerating Tomko, while also factoring in his substantial wealth as a reason for imposing a fine far above the Guidelines range. Indeed, the District Court provided more than just a boilerplate recitation of the § 3553(a) factors; it detailed, step-by-step, its individualized assessment of the sentence that it believed appropriate in this particular case.

The District Court's reasons are also "logical and consistent with the factors set forth in section 3553(a)." *Cooper*, 437 F.3d at 330 (internal quotations and citation omitted). They

31

are fully supported by the record. The Government does not dispute that Tomko had a negligible criminal history and that, because of his prominence in the company, his incarceration would threaten the jobs of Tomko, Inc.'s over-300 employees. As for Tomko's charitable works, even the Government conceded at oral argument that "[t]he district court was entitled to give it whatever weight the district court wanted." (Tr. of Oral Argument 17.) Several dozen letters written on Tomko's behalf prior to his sentencing also demonstrate Tomko's community ties and extensive charitable works. These letters indicate that Tomko performed pre-indictment charitable acts that involved not only money, but also his personal time. For several years, Tomko participated in a holiday gift drive in Finleyville, Pennsylvania. He provided Christmas gifts for thirty needy families, provided gloves and scarves to inner city children at a daycare center, and also helped other families in Marianna, Pennsylvania during the holiday season. One letter stated that Tomko performed all of this work anonymously. On a more individual basis, another letter noted how Tomko "helped a woman in the South Park area that had recently lost her husband and was left with four small children to raise by her[self]." He also went out of his way to accommodate his employees who needed extra time off for personal reasons. Tomko participated in other acts of charity for those in need. A pastor in the community noted Tomko's pre-indictment proclivity for aiding the poor, and stated that "[b]y requiring him to perform . . . community service, in lieu of incarceration, not only will you help the impoverished lives of the poor, but you

32

will also transform the life of Bill Tomko."

Additionally, at Tomko's sentencing proceeding, the Executive Director of Habitat for Humanity's Pittsburgh affiliate testified on Tomko's behalf. The Executive Director stated that the Pittsburgh affiliate had been in danger of being closed down by the national Board of Directors because of its precarious financial situation. The Executive Director testified that Tomko became personally involved in the construction and rehabilitation of several houses in the Pittsburgh area. Again, Tomko devoted not only a portion of his wealth, but also his personal time. The Executive Director stated that, for one house that had water runoff problems, "Mr. Tomko came and not only visited with the homeowner, inspected the basement to see what was the matter with the outside of the house, but also worked with the city to determine how best to redirect the water away from the yards. He put in the grading, he completed the front sidewalk, the back driveway, and put in a curb for the city." The Executive Director gave other examples of Tomko's providing his construction expertise to aid the Pittsburgh affiliate. The Executive Director then testified as to how Tomko could benefit Habitat for Humanity's efforts to build houses for poor families whose residences were damaged or destroyed by Hurricane Katrina. The Executive Director of the New Orleans affiliate confirmed that Tomko would be useful in these efforts. The Pittsburgh Executive Director concluded her direct testimony by reading a portion of a letter she wrote to the District Court, which stated that "there is no one like Bill Tomko who provides

33

timely, unselfish, and meaningful contributions to Pittsburgh Habitat for Humanity's construction operations."[10]

Pre-*Booker*, we approved of a similar sentencing departure on similar facts for similar reasons despite applying a higher standard of review. In *United States v. Fred E. Cooper*, 394 F.3d 172 (3d Cir. 2005), this Court held that a four-level downward departure was warranted because of the defendant's good works that were of a personal nature. *Id*. at 176–78. This departure resulted in three years probation for a defendant who pleaded guilty to one count of securities fraud and one count of subscribing to a false tax return, and had a Guidelines range of fifteen to twenty-one months. *Id*. at 174–75. Notably, this Court applied the less-deferential *de novo* standard of review that Congress required after 2003.[11] As a result, *Fred E. Cooper* weighs in favor of affirming Tomko's sentence. *See United States v. Jackson*, 467 F.3d 834, 839 (3d Cir. 2006) (instructing that "[p]re-*Booker* law regarding Guidelines departures,

---

[10]We realize that it is possible to question the sincerity of Tomko's work for Habitat for Humanity because it only began after his indictment. But this merely underscores the district court's institutional advantage at sentencing. Our view is from the level of thirty-thousand feet; appellate judges may *suspect* that these works have been corrupted by impure motives. The District Court, however, is on the ground and can better separate sincerity from self-seeking.

[11]*See supra* note 6.

34

therefore, necessarily informs the sentencing process—for district courts and for us").

It bears mentioning that the District Court's variance here was not substantial. The difference between Tomko's actual sentence and the lower end of his Guidelines range is twelve months. Calling it a 100-percent variance is misleading. As *Gall* points out, "deviations from the Guidelines range will always appear more extreme—in percentage terms—when the range itself is low, and a sentence of probation will always be a 100% departure . . . ." 128 S. Ct. at 595. Additionally, "quantifying the variance as a certain percentage of the maximum, minimum, or median prison sentence recommended by the Guidelines gives no weight to the 'substantial restriction of freedom' involved in a term of supervised release or probation." *Id*. (citation omitted).

We cannot say that, in absolute terms, the variance here was so large that it was *per se* unreasonable. In *Gall*, the Supreme Court affirmed a district court's probationary sentence where the advisory Guidelines range was thirty to thirty-seven months of imprisonment. 128 S. Ct. at 593. Similarly, post-*Gall*, a number of courts of appeals, including our own, have affirmed sentences that involved greater variances or departures than the one here. *See, e.g.*, *Howe*, 543 F.3d at 130 (affirming a probationary sentence where the Guidelines range was eighteen to twenty-four months of imprisonment); *see also United States v. Gardellini*, 545 F.3d 1089, 1094 n.5 (D.C. Cir.

35

2008) (collecting cases).[12]  "It will be a rare case when it is clear that no acceptable reasoning can justify a given sentence." *Levinson*, 543 F.3d at 195.  This is not one of them.

The Government claims that affirming Tomko's sentence promotes sentencing disparities and, in turn, undermines general deterrence.  Whatever the merits of this possibility, it does nothing to change our disposition.  The Government's concern is not new; it has been a point of constant focus throughout sentencing review's evolution.  Before the Guidelines existed, "[s]erious disparities in sentences . . . were common." *Mistretta*, 488 U.S. at 365.  When Congress created the mandatory Guidelines system, it did so "to 'provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities . . . [and] maintaining sufficient flexibility to permit individualized sentences when warranted.'" *Booker*, 543 U.S. at 264 (quoting 28 U.S.C. § 991(b)(1)(B)).  When the Supreme Court rendered the Guidelines advisory, it was fully aware that sentencing disparities would likely increase.  *See id*. at 263 ("We cannot and do not claim that use of a 'reasonableness' standard will provide the uniformity that Congress originally sought to secure.").

---

[12]Excluding *Howe*, the *Gardellini* Court identified nine post-*Gall* cases from the various circuits affirming upward and downward variances greater than twelve months.  *Gardellini*, 545 F.3d at 1094 n.5.

Despite that awareness, the *Booker* Court was confident that the advisory Guidelines system would "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id.* at 264–65. In *Gall*, the Court reaffirmed that "a more deferential abuse-of-discretion standard could successfully balance the need to 'reduce unjustified disparities' across the Nation and 'consider every convicted person as an individual.'" 128 S. Ct. at 598 n.8 (quoting *Koon*, 518 U.S. at 113).

If abuse-of-discretion review cannot strike such a balance, it is not our role as appellate judges to adjust the scales. "The National Legislature is equipped to devise and install, long term, the sentencing system, compatible with the Constitution, that Congress judges best for the federal system of justice." *Booker*, 543 U.S. at 265; *see also Gall*, 128 S. Ct. at 603 (Souter, J., concurring) ("I continue to think that the best resolution of the tension between substantial consistency throughout the system and the right of jury trial would be a new Act of Congress: reestablishing a statutory system of mandatory sentencing guidelines (though not identical to the original in all points of detail), but providing for jury findings of all facts necessary to set the upper range of sentencing discretion."). The risk of affirming an unwarranted sentencing disparity in this case is one we must accept while following the Supreme Court's "pellucidly clear" command that we apply the abuse-of-discretion standard of review. *Gall*, 128 S. Ct. at 594.

Our decision today should not suggest that variances of the size and character of Tomko's will always be substantively reasonable. District courts must make sentencing determinations on an individualized basis. *See Gall*, 128 S. Ct. at 597. Accordingly, the substantive reasonableness of each sentence must be evaluated on its own terms, based on the reasons that the district court provided, in light of the particular facts and circumstances of that case. As we recognized in *Howe*, "the point is that each case must be reviewed on its own . . . ." 543 F.3d at 141.

In sum, a significant number of us, if we were sitting as the district judge, might have applied the § 3553(a) factors differently had we been the sentencing court. But this disagreement does not, by itself, demand reversal. *Gall*, 128 S. Ct. at 597; *see also United States v. Schweitzer*, 454 F.3d 197, 204 (3d Cir. 2006) ("That we may ourselves have imposed a sentence different from that of the district court, based on our own de novo assessment of the evidence, is no basis to overturn the judgment."). We reverse only when we discern an abuse-of-discretion. Looking at the record before us, we fail to see one here.

V.

In order for the Guidelines regime to be truly advisory, a district court must be *potentially* able, when the proper situation arises, to sentence a defendant outside the Guidelines range but

38

within the statutory range. Any other conclusion would alter the statutory sentencing scheme enacted by Congress and interpreted by *Booker*. Here, the District Court conducted a thorough analysis of the § 3553(a) factors and provided a complete explanation of the reasons underlying Tomko's sentence. Holding Tomko's sentence unreasonable under these circumstances might exert a subtle, though unintended pressure upon district courts to either craft sentences within the Guidelines range or ignore substantial upward or downward variances altogether. Such a result would be contrary to *Rita*'s declaration that courts of appeals may adopt only a "*nonbinding* appellate presumption that a Guidelines sentence is reasonable . . . ." *Rita*, 127 S. Ct. at 2466 (emphasis added).

Our holding in this case is not an exercise in self-abnegation. Courts of appeals unquestionably have an important role to play in reviewing district courts' sentencing decisions. But it is a limited role. Neither *Gall* nor *Rita* suggests that courts of appeals should do anything more than ensure the reasonableness of federal sentences. It bears repeating that "[t]he touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *Grier*, 475 F.3d at 571. Simply put, reasonableness review requires us to do nothing more and nothing less than to apply the deferential abuse-of-discretion standard, a role quite familiar to us. *Gall*, 128 S. Ct. at 594. "We do not seek to second guess. Given the widely recognized institutional advantages that district courts

39

have in access to and consideration of evidence, we would be foolish to try." *Levinson*, 543 F.3d at 196.

We must be mindful that the Sentencing Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives," *Rita*, 127 S. Ct. at 2465, and the Sentencing Commission has carried out those objectives at "wholesale," *id*. at 2463. The sentencing judge, in contrast, carries out the § 3553(a) objectives at "retail," *id*., because "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court," *id*. at 2469. Here, the record demonstrates the District Court's thoughtful attempt to tailor the off-the-rack Guidelines recommendations into a sentence that fits Tomko personally. Where it believed the Guidelines recommendations too large or too small—for example, in the advisory ranges for imprisonment and fine—the Court took care to explain why this was the case before making the adjustments it felt necessary. This is precisely the type of individualized assessment that *Gall* demands, and to which we must defer. Accordingly, we will affirm the sentence that the District Court imposed.

FISHER, *Circuit Judge*, *dissenting*, with whom Chief Judge Scirica, Judge Sloviter, Judge Rendell and Judge Cowen join.

I.

As the procedural history of this appeal clearly shows, this Court has wrestled with the decision in this case for close to two and one half years, during which time the judges on this Court have tried to determine whether the sentence given for this crime was substantively reasonable. The offense we encounter in this case is no garden variety tax evasion. The conduct underlying the offense involved an intricate scheme spanning several years and involved the coercion and coordination of numerous other individuals, all for the personal gain of one man, William G. Tomko, Jr., a successful business owner with the means to easily pay the taxes he owed to the Government.

Tomko's fraudulent tax evasion scheme revolved around the construction of his luxurious new home in southwestern Pennsylvania. During the construction of this home, Tomko had subcontractors falsify their billing invoices to make it appear their work had been done for his construction company, W.G. Tomko, Inc. ("Tomko, Inc."), at one of its job sites, rather than for Tomko, the individual, at his personal residence. The Internal Revenue Service-Criminal Investigation Division investigators interviewed seventeen individuals with respect to Tomko's scheme. While the details varied from individual to individual, a consistent pattern of conduct emerged: At Tomko's behest, subcontractors who performed work at his residence were instructed to write billing invoices that made it

41

appear that their work had been done at one of five local area schools. Because Tomko, Inc. was working jobs at these local schools, the company could appear to be legitimately paying the invoices.[13] As a result, the construction costs were diverted from Tomko personally to Tomko's company, which then deducted them as business expenses, while Tomko also failed to report as personal income the value of the services provided to him at no cost. Thus, Tomko's income was under-represented in two regards: The profits earned by his business appeared to be less and the substantial benefit he received as a result of the construction of a new 8,000-square-foot home went unreported.[14]

Tomko's scheme resulted in a stipulated tax deficiency of $228,557; however, a disputed portion of the record included evidence that the pervasiveness of his scheme was even more extensive. In particular, the Government presented evidence that Tomko on more than one occasion told individuals that his

---

[13]Upon the receipt of these invoices, Tomko, Inc. paid the subcontractors in the normal course of business and posted the expenses to the jobs that were listed on the invoices.

[14]Because Tomko, Inc. is classified as a "flow-through" Subchapter S Corporation under the federal tax code, Tomko, the individual, was required to include on his personal income tax return his share of the company's items of income, deduction, loss, and credit.

vacation home in Maryland was "a gift from Uncle Sam." Because the Government was unable to provide reliable figures to account for the impact of this alleged fraud with respect to the tax loss incurred by the Government, this disputed evidence apparently did not factor into the District Court's judgment of sentence, and we mention it solely to underscore the point that we are not faced with a garden variety case of tax evasion.

Tomko pleaded guilty to a one-count information charging him with tax evasion, in violation of 26 U.S.C. § 7201. His properly calculated Guidelines range was twelve to eighteen months of incarceration. At Tomko's sentencing hearing, the District Court stated that it had reviewed and considered all motions and briefs submitted by the parties and then stated on the record its consideration of the Guidelines and the § 3553(a) factors.

The District Court then sentenced Tomko to 250 hours of community service, three years of probation with one year of home confinement, and ordered him to pay a fine of $250,000. Tomko was also ordered to undergo twenty-eight days of in-house alcohol treatment. As reason for this judgment, the District Court stated:

> "Defendant stands before us for sentencing after pleading guilty to tax evasion. A review of the Defendant's financial condition paints a picture of a very wealthy man who had the means and the

43

wherewithal to easily pay whatever tax obligation is owing. He was a successful businessman earning a significant salary. There is simply no reason for him to have done this.

This being said, I also note his negligible criminal history, his record of employment, his support for and ties in the community, and extensive charitable work he has done. I have also – therefore, I have sentenced him to a period of probation, which I recognize is below the guideline range. Given the Defendant's wealth, the guideline range in fines is insufficient deterrence.

Therefore, I've done this mitigation of the sentence under the provisions set forth in 18 U.S.C. § 3553 for the reasons I stated. Taking all these factors into account, the Court sentences the Defendant to a period of probation, a substantial fine, and allows for repayment to the Internal Revenue Service of his outstanding tax obligation. The Court views that this sentence will address the sentencing goals of punishment, deterrence and rehabilitation."

As this excerpt demonstrates, the District Court recognized that the sentence was below the Guidelines and did not include a

44

term of imprisonment, but explained that it had mitigated the sentence for its stated reasons in conjunction with the factors set forth in § 3553(a).[15]

In accordance with the standard announced by the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), our task on appeal is to review the sentence imposed by the District Court for "reasonableness."[16] In *Gall v. United States*,

---

[15]The District Court in this case did not grant Tomko a downward departure based on his charitable acts or any other ground, but rather took them into consideration as mitigating factors in the course of its analysis of § 3553(a). *See United States v. Vampire Nation*, 451 F.3d 189, 195 n.2 (3d Cir. 2006) (explaining the distinction between departures and variances).

[16]Our post-*Booker* precedent instructs district courts to follow a three-step sentencing process: (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*; (2) in doing so, they must formally rule on the motions of both parties, state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force; and (3) they are required to "exercise their discretion by considering the relevant § 3553(a) factors" in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines. *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (alterations omitted).

45

128 S. Ct. 586 (2007), the Supreme Court clarified that appellate reasonableness review involves two steps: the first procedural and the second substantive. The Supreme Court categorized, inter alia, "failing to consider the § 3553(a) factors" and "failing to adequately explain the chosen sentence," as procedural errors under the first step of *Gall*. *Id.* at 597. The Court then instructed:

> "Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the *substantive reasonableness* of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances, *including the extent of any variance from the Guidelines range*. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness. *It may consider the extent of the deviation*, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance."

*Id.* (internal citation omitted) (emphasis added); *accord United*

46

*States v. Wise*, 515 F.3d 207, 217-18 (3d Cir. 2008) ("As an appellate court, our role is two-fold. . . . If we determine that the district court has committed no significant procedural error, we then review the substantive reasonableness of the sentence under an abuse-of-discretion standard . . . .").

The Court in *Gall* also reaffirmed its decision in *Rita v. United States*, 127 S. Ct. 2456 (2007), which emphasized the importance of reviewing sentences for substantive reasonableness. *See Gall*, 128 S. Ct. at 596-98. As the Supreme Court stated in *Rita*: "In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur." 127 S. Ct. at 2466-67. Consequently, the substantive component of reasonableness review, while deferential, is not impotent.

For these reasons, we disagree with the Majority's statement that "if the district court's sentence is procedurally sound, we will affirm it unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided." Majority Op. at Part II.C. We recognize that "appellate review of sentencing decisions is limited to determining whether they are 'reasonable,'" *Gall*, 128 S. Ct. at 594, but we believe that encompassed within this limited role is the authority and the obligation to vacate sentences that are substantively unreasonable. Therefore, although the Supreme Court "made it

47

pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions," *id.*, we cannot agree with the Majority's characterization of the appellate courts' role in reviewing sentences as "requir[ing] us to do nothing more and nothing less than to apply the deferential abuse-of-discretion standard." Majority Op. at Part V. We believe that when the Supreme Court instructed appellate courts to review for both procedural and substantive reasonableness, it meant what it said. Accordingly, because we conclude that this sentence is substantively unreasonable, we dissent.

## II.

This case presents the opportunity for us to examine the implications of the Supreme Court's directive in *Gall* that in reviewing for reasonableness, appellate courts are to conduct a substantive inquiry as well as a procedural one. We are not the first court of appeals which has wrestled with the concept of engaging in a deferential review of the substantive reasonableness of sentences. *See*, *e.g.*, *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) ("At the substantive stage of reasonableness review . . . we consider whether the factor, as explained by the district court, can bear the weight assigned it under the totality of circumstances in the case. . . . Accordingly, we will continue to patrol the boundaries of reasonableness, while heeding the Supreme Court's renewed message that responsibility for sentencing is placed largely in the precincts of the district courts."); *United States v. Taylor*, 532 F.3d 68, 69-70

(1st Cir. 2008) (explaining its view that although district courts are "empowered with considerable discretion in sentencing," recent Supreme Court decisions have also "underscored the importance of the district court's justifications" for sentencing decisions); *United States v. Abu Ali*, 528 F.3d 210, 265 (4th Cir. 2008) ("While *Gall* assuredly made clear the limited and deferential role of appellate courts in the sentencing process, *see* [128 S. Ct.] at 597-98, it was not a decision wholly without nuance or balance.").  The Court of Appeals for the Eleventh Circuit provided the following explanation post-*Gall*:

> "[*Gall*'s] directives leave no doubt that an appellate court may still overturn a substantively unreasonable sentence, albeit only after examining it through the prism of abuse of discretion, and that appellate review has not been extinguished.  Thus, a sentence still may be substantively unreasonable if it does not achieve the purposes of sentencing stated in § 3553(a).  So, even though we afford 'due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance,' *Gall*, 128 S. Ct. at 597, we may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence.  We are therefore still required to make the calculus ourselves, and are obliged to remand for

49

resentencing if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case."

*United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008) (select internal quotation marks and citations omitted).

We agree wholeheartedly with the reasoning expressed by our sister circuits. If the substance of a sentence is not "logical and consistent" with the § 3553(a) factors or fails to "reasonably appl[y]" them to "the circumstances of the case," *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006), the sentence is not substantively reasonable and does not survive abuse-of-discretion review. Therefore, while "reasonableness is a range, not a point," *id.* at 332 n.11, a range by definition has both upper and lower limits that will be exceeded in some cases. *See Eastway Construction Corp. v. City of N.Y.*, 821 F.2d 121, 123 (2d Cir. 1987) ("The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; at the same time, a decision outside those limits exceeds or, as it is infelicitously said, 'abuses' allowable discretion."). In this case, we undertake our duty, as outlined in *Gall*, to review whether the sentence Tomko received exceeded the lower bounds of that range.

50

III.

The Government, as the appellant in this case, bears the burden of establishing that the sentence imposed is unreasonable in light of both the record and the § 3553(a) factors. *Cooper*, 437 F.3d at 332. The Government states that the "bottom line" in this case is "that a rich defendant was allowed to buy his way out of a prison sentence." While we resist such ad hominem arguments and do not think the finer issues presented by this appeal can be so bluntly summarized, we do share what we perceive to be the underlying sentiment of the Government's appeal. That is, a defendant who committed a very serious offense "did not receive so much as a slap on the wrist – it was more like a soft pat." *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006). As we will more fully explain, the District Court abused its discretion in imposing the sentence it did in this case in light of the facts and circumstances in the record and the § 3553(a) factors.

A.

As an initial matter, we address the Government's argument that Tomko's sentence was procedurally unreasonable because the District Court failed to consider general deterrence in arriving at its sentencing decision. We find this argument unavailing. Although the District Court never expressly mentioned general deterrence, the Majority correctly notes that a sentencing court is not required to "discuss and make findings

51

as to each of the § 3553(a) factors if the record makes clear the court took the factors into account in sentencing." *Cooper*, 437 F.3d at 329. Based on the record, we cannot conclude that the District Court failed to consider deterrence in the course of sentencing Tomko.

And while our task of reviewing the reasonableness of a sentence would be aided by a more explicit analysis of the District Court's consideration of deterrence, whether specific or general, ultimately this perceived procedural deficiency is not at the root of the sentence's unreasonableness. As the Government acknowledged at oral argument, even if the sentence was vacated and remanded to the District Court in order to remedy this alleged procedural error, if the District Court nonetheless imposed the same sentence, the Government would still maintain that the sentence was unreasonable. Thus, it is not the District Court's failure to expressly consider general deterrence that causes us to doubt the reasonableness of the sentence so much as the "totality of the circumstances" surrounding the District Court's decision and the "extent of . . . variance from the Guidelines range." *Gall*, 128 S. Ct. at 597. Accordingly, although we may question whether the sentence the District Court imposed reflects the sentencing goal of deterrence, under *Gall*'s two-step framework, this concern relates to the substantive reasonableness of the sentence as opposed to its procedural reasonableness.

B.

52

Based on the guidance that the Supreme Court in *Gall* provided to appellate courts with respect to engaging in substantive reasonableness review, we begin our task by looking to the Sentencing Guidelines. *See id.* ("When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range. If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness. But if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness." (internal citation omitted)); *see also Taylor*, 532 F.3d at 70 ("[T]he guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must 'be supported by a more significant justification than a minor one.'" (quoting *Gall*, 128 S. Ct. at 597) (select internal quotation marks omitted)).[17] And although the

_____

[17]We need not resolve today whether our appellate review extends to ensure that district courts "must" support a major deviation by a more significant justification. All the Supreme Court stated in *Gall* was that it found it "uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Gall*, 128 S. Ct. at 597. We thus leave for another day the task of defining the precise contours of that statement. Nonetheless, we note the nuanced distinction in language to highlight just how modest our appellate approach is. Here, even when we do not require "a more significant justification" from the District Court for its "major" deviation from the Guidelines, the justification it did

53

Guidelines are advisory, they must still be afforded due weight as a factor under § 3553(a)(4). *See Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (explaining that the Court's decisions have "preserved a key role for the Sentencing Commission . . . [, which] has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise" (internal quotation marks and citation omitted)); *United States v. Goff*, 501 F.3d 250, 260 (3d Cir. 2007) ("[O]ne of the reasons that the Guidelines are of significant assistance in sentencing is that they incorporate the results of research into what may be called the 'heartland' of sentencing considerations and incarceration periods for typical offenses and offenders."); *see also Abu Ali*, 528 F.3d at 261 ("[T]he applicable guidelines range plays an important role.").

Indeed, the Guidelines continue to be a vital force in sentencing as they "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 127 S. Ct. at 2465; *see also id.* at 2463 ("The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale. . . . [The Commission] has tried to embody in the Guidelines the factors and considerations set forth in § 3553(a)."); *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007) (describing the Guidelines as "drafted by a

provide fails to support the degree of downward variance.

54

respected public body with access to the best knowledge and practices of penology").

As numerous courts have recognized, the Guidelines serve a particularly important purpose in the area of white-collar crime. For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals." *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes . . . ."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses"). In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> "Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to

55

small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*"

455 F.3d 1227, 1240 (11th Cir. 2006).

In light of the important position that the Guidelines continue to occupy in sentencing decisions, the Supreme Court teaches that, in reviewing for substantive reasonableness, we are to take into account "the extent of any variance from the Guidelines range." *Gall*, 128 S. Ct. at 597. Here, the District Court's decision to vary from the recommended sentence of twelve to eighteen months of imprisonment under the Guidelines all the way down to a term of probation amounts to a 100% downward variance. Moreover, there is an important qualitative difference between incarceration and no incarceration, such that the Supreme Court in *Gall* specifically "recognize[d] that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms." *Id.* at 595. Therefore, unlike the Majority, which characterizes this variance as "not substantial," Majority Op. at Part IV, we believe that the variance the District Court granted to Tomko constitutes both a quantitatively and qualitatively significant

56

deviation from the Guidelines.[18]

Consistent with the Supreme Court's instructions in *Gall*, although we "may consider the extent of the deviation, [we] must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Id.* at 597. Accordingly, we will consider, with appropriate deference to the District Court, whether the § 3553(a) factors widen or shift the District Court's range of reasonable choices to include the sentence it imposed, and thereby justify the extent of the variance. Because we are to "take into account the totality of the circumstances" in the course of our reasonableness review, *id.*, we will look first to the § 3553(a) factors upon which the District Court expressly based its decision to mitigate the sentence, and then we will look to the other relevant factors, as they relate to the facts and circumstances of record, which the District Court may have

---

[18]We do not mean to suggest that white-collar offenses in general or tax evasion in particular must be met by a sentence of incarceration. *See*, *e.g.*, S. Rep. No. 98-225, at 91-92 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3275 ("The placing on probation of [a white-collar criminal] may be perfectly appropriate in cases in which, under all the circumstances, only the rehabilitative needs of the offender are pertinent; such a sentence may be grossly inappropriate, however, in cases in which the circumstances mandate the sentence's carrying substantial deterrent or punitive impact.").

mentioned but did not rely upon.

1.

The District Court concluded that a significant downward variance was merited in Tomko's case because of his: (1) negligible criminal history; (2) record of employment; and (3) support for the community and extensive charitable work. Under § 3553(a)(1), the District Court was free to consider each of these circumstances as part of Tomko's "history and characteristics." *See Rita*, 127 S. Ct. at 2473 (Stevens, J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines [but are] matters that § 3553(a) authorizes the sentencing judge to consider."). However, just because these circumstances were permissible considerations in the District Court's sentencing calculus does not resolve whether they actually justified the significant variance which the District Court granted, and therefore we will review each of these "mitigating" circumstances in turn.[19]

_____

[19]The Majority emphasizes that the District Court "conducted a thorough analysis of the § 3553(a) factors and provided a complete explanation of the reasons underlying Tomko's sentence." Majority Op. at Part V. However, because "failing

58

With respect to negligible criminal history, the Government argues, citing *Koon v. United States*, 518 U.S. 81, 111 (1996), that reliance on this consideration as a mitigating factor is inappropriate insofar as Tomko's criminal history is already accounted for in the calculation of his Guidelines range. However, under § 3553(a), the District Court was permitted to give further weight to a factor covered by a specific Guidelines provision. *See United States v. Johnson*, 427 F.3d 423, 428 (7th Cir. 2005) (stating that sentencing courts can "give further weight to a factor covered by a specific guidelines adjustment, especially where (as is true here) that 'factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present'" (quoting *Koon*, 518 U.S. at 96)). Still, while negligible criminal history may have been an appropriate consideration for the sentencing court to take into account as relevant to "the history and characteristics of the defendant" under § 3553(a)(1), it does

to consider the § 3553(a) factors" and "failing to adequately explain the chosen sentence" are examples that the Supreme Court provided in *Gall* of what constitutes "significant procedural error," 128 S. Ct. at 597, the District Court's explanation of its chosen sentence and discussion of the § 3553(a) factors are merely indicative of a procedurally reasonable sentence but do not resolve whether the sentence is substantively reasonable. Therefore, what the Majority applauds the District Court for doing is necessary but not sufficient in order for a sentence to be reasonable.

59

not provide strong support for the variance in this case because Tomko's status as a "first-time offender" does not differentiate him from many, if not most, tax evaders. *See Goff*, 501 F.3d at 261 (explaining that the defendant's "criminal history, in Category I, is similar to the vast majority of those convicted" of the same offense, and therefore, the defendant "is no outlier; he is, on the contrary, plainly in the 'heartland' of offenders."). Where a consideration speaks well of a defendant but in a manner typical of many similarly situated defendants, a district court's over-reliance on it, i.e., by varying significantly downward both quantitatively and qualitatively from the typical sentence imposed on such defendants, signifies an abuse of discretion.[20]

Similarly, in some cases it is appropriate for the sentencing court to consider the defendant's record of employment as a mitigating factor under § 3553(a)(1). However, with respect to Tomko, the significance of his

---

[20]By referring to this stated justification for the variance as "typical" of other tax evaders, we are not suggesting that a closer review of the sentence is warranted or that this observation in any way alters our deferential standard of review. Rather, our purpose in describing this consideration as "typical" is to highlight that it fails to broaden the District Court's range of permissible sentencing choices because it would apply with equal force to most other defendants and therefore cannot accurately be characterized as a "mitigating" circumstance.

employment record is arguably equivocal at best. Indeed, the District Court heard evidence that presented Tomko as "a person with a high school education who built a multi-million dollar company and hires . . . 300 people and looks after them like family," and that Tomko's absence from the company could place Tomko, Inc. in financial trouble. But, as the Government points out, the District Court also found that Tomko "had threatened the contractors with nonpayment and lost business opportunities unless they submitted falsified invoices as defendant instructed." Thus, this conflicting evidence creates considerable tension.

Nonetheless, even if we assume that the positive aspects of Tomko's employment record outweigh the negative aspects, consideration of this circumstance fails to distinguish Tomko from other tax evaders – as was true of his negligible criminal history – and therefore falls far short of widening the range of decisions permitted by § 3553(a) to include the sentence the District Court imposed. An admirable record of employment is a characteristic common to many white-collar criminals, and the prospect of business failure seems of little relevance as a mitigating circumstance when the business itself was the vehicle through which the defendant perpetrated the crime. *See United States v. Sharapan*, 13 F.3d 781, 785 (3d Cir. 1994) (de-emphasizing the fact that the imprisonment of the principal of a business "for mail fraud and filing false corporate tax returns may cause harm to the business and its employees. The same is presumably true in a great many cases in which the principal of

61

a small business is jailed for comparable offenses . . . ."); *United States v. Reilly*, 33 F.3d 1396, 1424 (3d Cir. 1994) (de-emphasizing "the fact that [the defendant's] conviction may harm not only his business interests but also those of his family members"). Although a variance rather than a departure is at issue in the present case, the pre-*Booker* cases from our Court still provide valuable insight into what constitute meaningful mitigating factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) ("[O]ur Circuit's pre-*Booker* case law . . . continues to have advisory force." (alterations and internal quotation marks omitted)). Accordingly, Tomko is no different than most tax evaders with respect to this "mitigating" circumstance, and therefore it does not stand up as a justification for varying from a year or more of imprisonment, as called for under the Guidelines, to no imprisonment at all.

Finally, the District Court relied heavily on Tomko's community ties and purportedly extensive charitable work. It reviewed more than fifty letters of support, most of which paint a picture of Tomko as a man with great concern for his employees and his community. Some attest to truly admirable acts of kindness. Similarly, the Majority discusses at length the evidence pertaining to Tomko's philanthropic acts. *See* Majority Op. at Part IV. However, the Guidelines provide that a defendant's prior good works – such as civic, charitable, or public service – are "not ordinarily relevant," and discourage downward departures from the normal sentencing range based on these types of considerations. *See* U.S. Sentencing

62

Guidelines Manual § 5H1.11; *Koon*, 518 U.S. at 96 ("If the special factor is a discouraged factor . . . the court should depart only if the factor is present to an exceptional degree . . . ."). Although in the post-*Booker* world, the District Court may consider such good works in the context of § 3553(a)(1), we think it is important to keep in mind that Congress, through the Commission, did not intend for this information to ordinarily be taken into account by sentencing courts. Thus, we find it troubling that the District Court, as well as the Majority, placed so much credence in this one, previously prohibited consideration as justifying the significant variance at issue here.

The Government views the letters written in support of Tomko with jaundiced eyes, noting that many, if not most, of these letters were from Tomko's own employees and that one might expect such individuals to be easily "persuaded" to pen arguably overwrought letters of support and concern. We find it unnecessary to weigh in with our own cynical speculations as to the underlying motives of the authors of these letters, as we find that Tomko's "support in the community" and "charitable work" simply do not justify the degree of variance that was granted in this case, especially because his negligible criminal history and employment record keep him squarely in the category of typical tax evaders.[21] Even assuming arguendo the

---

[21]We pause to note that we believe the Majority's focus on the fact-bound nature of sentencing as a reason not to disturb the District Court's chosen sentence in this case is overstated.

purest of motives for Tomko's well-timed interest in Habitat for Humanity, and viewing as completely altruistic the letters attesting to his beneficence, this single consideration – which arguably differentiates Tomko more than the other "mitigating" circumstances on which the District Court relied – at most justifies some downward variance, but not to the degree the District Court chose here. *See Goff*, 501 F.3d at 261 n.16 (concluding, in the course of finding the sentence substantively unreasonable, that the district court "put undue emphasis on [the defendant's] service to the community").

Viewed cumulatively, out of the three reasons offered by the District Court for mitigating Tomko's sentence, only one – community support based on charitable work – even begins to justify a downward variance in this case. Thus, these considerations fall short of placing the sentence imposed within the albeit broad range of permissible choices, even when we add them together. Moreover, the "mitigating" circumstances relied upon by the District Court only address one of the § 3553(a)

While we do not question that "district courts have an institutional advantage over appellate courts" in making sentencing determinations, *Gall*, 128 S. Ct. at 598, and that this superior vantage point with respect to individualized sentencing drives our deferential standard of review, we do not believe that this case presents such a fact-intensive sentencing decision that on appeal we must refrain from drawing our own conclusions about the evidence of record.

64

factors, namely "the history and characteristics of the defendant" under § 3553(a)(1), and therefore do not reflect the "totality of the circumstances" and the "§ 3553(a) factors, on a whole." *Gall*, 128 S. Ct. At 597. As a number of our sister courts of appeals have recognized, excessive reliance on a single § 3553(a) factor is indicative of an unreasonable sentence. *United States v. Hampton*, 441 F.3d 284, 288-89 (4th Cir. 2006); *United States v. Givens*, 443 F.3d 642, 646 (8th Cir. 2006); *see also Cavera*, 550 F.3d at 191 (considering whether a particular "factor relied on by a sentencing court can bear the weight assigned to it"). As the remainder of our analysis reveals, the District Court's over-reliance on § 3553(a)(1) as justification for the significant qualitative and quantitative variance it granted pales in comparison to the numerous § 3553(a) factors which suggest that a term of imprisonment is warranted in a case of tax evasion as willful and brazen as Tomko's.[22]

---

[22]By concluding that the District Court's stated reasons for granting a significant variance fail to justify its decision, we are not advancing some permutation of the "proportionality test." What the Supreme Court invalidated in *Gall* was a rule of appellate review which requires the use of a rigid mathematical formula whereby an extraordinary deviation from the Guidelines must be matched with an extraordinary justification. 128 S. Ct. at 595. Here, we have done only what the Supreme Court outlined in *Gall* by taking "the degree of variance into account and consider[ing] the extent of deviation from the Guidelines" as we review the "totality of the circumstances" and the "§ 3553(a) factors, on a whole." *Id.* at 595, 597.

2.

Viewed cumulatively, we conclude that the relevant § 3553(a) factors advocate in the strongest possible terms for a sentence including a term of imprisonment. Beginning with § 3553(a)(1), district courts are instructed to consider not only a defendant's "history and characteristics," but also "the nature and circumstances of the offense," which the District Court did not emphasize. In this respect, Tomko did much more than fail to report income on a form; he conceived of a sophisticated plan to evade taxation and compelled multiple individuals to aid him in the scheme. This scheme spanned several years, involved the planning, coordination, and coercion of numerous subcontractors, required a complicated system of concealment through fraudulent billing, and resulted in a stipulated tax loss of over $225,000. Thus, while the District Court's stated justifications for mitigating Tomko's sentence fail to differentiate him from other tax evaders, the severity of his offense and the extent of his culpability, as evidenced by the willful and brazen nature of his conduct, remove Tomko's tax evasion from the garden variety type. As such, even assuming "the history and characteristics of the defendant" point in the direction of a lenient sentence, "the nature and circumstances of the offense" certainly do not.

Under § 3553(a)(2), sentencing courts are instructed to consider the need for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and

66

provide just punishment for the offense; (B) afford adequate deterrence; (C) protect the public from further crimes of the defendant; and (D) facilitate rehabilitation. The District Court did consider the need to afford adequate deterrence to Tomko's own criminal conduct, i.e., "specific deterrence," and imposed a substantial fine to effectuate this sentencing goal. However, relying on a hefty fine in lieu of imprisonment as a means to deter Tomko from future criminal activity only reinforces the perception that wealthy defendants can buy their way out of a prison sentence.[23] Moreover, we fail to see how the sentence reflects the equally important need to deter others, i.e., "general deterrence." *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal alterations, quotation marks, and citation omitted)); *Mueffelman*, 470 F.3d at 40 (noting the importance of "the deterrence of white-collar

---

[23]The Majority characterizes the absence of a term of imprisonment and the presence of a significant fine as a "simple coincidence." Majority Op. at Part IV. We believe the record indicates otherwise. Specifically, immediately after the District Court announced its decision to sentence Tomko to probation instead of imprisonment, the District Court followed up by stating that a large fine was necessary to provide deterrence to Tomko. Thus, we cannot agree that the District Court's decision to impose a substantial fine had nothing to do with its decision not to impose any period of incarceration.

crime (of central concern to Congress)").  Thus, we are concerned about the message a sentence of probation for this indisputably serious offense of willful tax evasion sends to the public at large and would-be violators.

The Government argues that in this case "real deterrence is jail," and this position finds support in *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006).  The underlying facts of *Ture* and our own case are nearly identical.  Ture, like Tomko, induced others to disguise income as deductible corporate expenses.  *Id.* at 354.  This failure to report funds as income led to a tax deficiency of $240,252 in Ture's case, *id.* at 355, whereas in Tomko's case the stipulated tax deficiency was $228,557.  Additionally, in both cases the Guidelines range was twelve to eighteen months, and both district courts sentenced the defendants to probation and community service rather than imprisonment.  Concluding that the district court's granting of a downward variance was unreasonable, the Court of Appeals for the Eighth Circuit noted that, "[a]s the Guidelines explain, willful tax evaders often go undetected such that those who are caught . . . evading nearly a quarter-million dollars in tax must be given some term of imprisonment."  *Id.* at 358.  It reasoned that, in the case of a willful tax evader like Ture, "[t]he goal of deterrence rings hollow if a prison sentence is not imposed . . . ." *Id.*

We find the reasoning of *Ture* persuasive.  The sentence in this case, like the sentence in *Ture*, represents "in effect, a

68

100% downward variance from the Guidelines range," *id.* at 357, which means that Tomko avoids serving any time in a federal prison. Moreover, Tomko's sentence of probation included home confinement in the very mansion built through the fraudulent tax evasion scheme at issue in this case – an 8,000-square-foot house on approximately eight acres, with a home theater, an outdoor pool and sauna, a full bar, $1,843,500 in household furnishings, and $81,000 in fine art. The perverse irony of this gilded cage confinement was not lost on the Government, it is not lost on us, and it would not be lost on any reasonable public observer of these proceedings, including those would-be offenders who may be contemplating the risks associated with willful tax evasion. Accordingly, we find that the sentence imposed by the District Court fails to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct, and therefore is inconsistent with the sentencing goals outlined in § 3553(a)(2)(A)-(B).

Under § 3553(a)(5), districts courts are instructed to consider "any pertinent policy statement . . . issued by the Sentencing Commission . . . in effect on the date the defendant is sentenced." Notably, the relevant Guidelines policy statements in this case reiterate and reinforce the sentencing mandate of § 3553(a)(2)(A)-(B). For example, the following policy statement further emphasizes the seriousness of the offense of tax evasion, observing:

69

> "Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses . . . that in the Commission's view are 'serious.'
>
> The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation previously was frequently given and provide for at least a short period of imprisonment in such cases."

U.S. Sentencing Guidelines Manual ch. 1, pt. A, introductory cmt. 4(d). In addition, the following policy statement underscores the need for tax prosecutions to provide just punishment, promote respect for the law, and provide deterrence:

> "Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent

70

to would-be violators."

U.S. Sentencing Guidelines Manual ch. 2, pt. T, introductory cmt. These policy statements clearly indicate the Sentencing Commission's reasoned judgment that the offense of tax evasion should be met with a term of imprisonment in order to further the goals of sentencing. Thus, § 3553(a)(5) is yet another factor which points in the opposite direction of the sentence that the District Court chose to impose here.

Section 3553(a)(6) further directs sentencing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The Guidelines elaborate on this theme, explaining:

> "Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced."

U.S. Sentencing Guidelines Manual § 2T1.1 cmt. background; *see also Kimbrough*, 128 S. Ct. at 573-74 ("[A]dvisory

71

Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to avoid excessive sentencing disparities." (internal quotation marks omitted)); *Booker*, 543 U.S. at 255 ("Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing . . . ."); *id.* at 263 (emphasizing that reasonableness review will play a central role in advancing Congress's original aim in enacting the Sentencing Reform Act because it will "tend to iron out sentencing differences"); *Goff*, 501 F.3d at 261 (finding an unreasonably lenient sentence when the district court deviated drastically from the norm with respect to a defendant in the "heartland" of offenders rather than an outlier).

The District Court stated on the record that "it recognized the need for consistent sentencing" but imposed a sentence that contributes to, rather than reduces, the marked disparity that Congress and the Commission sought to avoid. The District Court's use of a substantial fine to counterbalance its decision not to impose a term of imprisonment is inconsistent with Congress's clear intent, as expressed in the Sentencing Reform Act and § 3553(a), to reduce unwarranted disparities in sentencing, so often based on socio-economic status. *See*, *e.g.*, *Mueffelman*, 470 F.3d at 40 (noting the importance of "limits on the ability of those with money or earning potential to buy their way out of jail"); *United States v. Seacott*, 15 F.3d 1380, 1389 (7th Cir. 1994) ("Allowing sentencing courts to depart downward based on a defendant's ability to make restitution

72

would thwart the intent of the guidelines to punish financial crimes through terms of imprisonment by allowing those who could pay to escape prison. It would also create an unconstitutional system where the rich could in effect buy their way out of prison sentences."); *United States v. Harpst*, 949 F.2d 860, 863 (6th Cir. 1991) ("[P]ermitting greater leniency in sentencing in those cases in which restitution is at issue *and* is a meaningful possibility (i.e., generally white-collar crimes) would, we believe, nurture the unfortunate practice of disparate sentencing based on socio-economic status, which the guidelines were intended to supplant."). Because the mitigating factors that the District Court relied upon to justify granting a significant variance fail to distinguish Tomko from other "defendants with similar records . . . found guilty of similar conduct," the District Court's sentencing decision flies in the face of § 3553(a)(6) by further contributing to unwarranted disparities. If anything, the distinctions between Tomko and other defendants actually militate toward imposing more severe punishment on Tomko than on someone who committed garden variety tax evasion. Thus, we cannot conclude that the far more lenient sentence imposed in this case is consistent with § 3553(a)(6).

In sum, our review leads us to conclude that the § 3553(a) factors overwhelmingly support a sentence of imprisonment. The District Court's reliance on Tomko's negligible criminal history, employment record, and community support and charitable activity – which relate to only the second half of § 3553(a)(1), "the history and characteristics of the

73

defendant" – as justification for Tomko's sentence results in an abuse of discretion because it fails to overcome the dramatically contrary conclusion dictated by virtually every other relevant § 3553(a) factor.[24]  A sentence of probation, community service, and a fine is substantively unreasonable in light of "the totality of the circumstances" and "the § 3553(a) factors, on a whole." *Gall*, 128 S. Ct. at 597.  By granting a variance all the way down to probation, the District Court exceeded the lower outer limit of the range of appropriate choices it had the discretion to make, and in doing so abused that discretion.

We reiterate that we do not maintain that any below-Guidelines sentence would have been improper in this case, only that the District Court exceeded its discretion in rendering this particular below-Guidelines sentence.  *See Abu Ali*, 528 F.3d at 265 ("While we take exception to the sentence's degree of deviation for the reasons we discuss, we do not seek to deprive the district court of discretion upon remand.  Rather, our difference with the sentencing court here is based on the fact that the specific justifications offered were not 'sufficiently

---

[24]To be clear, we acknowledge that § 3553(a)(3) and (7) arguably support certain aspects of the District Court's lenient sentence, but we find it unnecessary to elaborate on these factors because we conclude that they are overpowered by § 3553(a)(1), (2), (4), (5), and (6), which advocate in the strongest possible terms for a sentence that includes some duration of imprisonment.

74

compelling to support the degree of the variance.'" (quoting *Gall*, 128 S. Ct. at 597)).[25] Indeed, any number of facts could have been present in the record to place the District Court's sentence within the range of reasonable choices. But none of those facts existed here. At the same time, we need not articulate in speculative fashion the precise facts that would render a non-imprisonment sentence reasonable. Suffice it to say, this dissent would not close the door on the ability of facts not in Tomko's record to support significant downward variances in future cases. We would leave ample room for the District Court's discretion, but "discretion, like the hole in the doughnut, does not exist except as an area left open by a surrounding belt of restriction." *Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am.*, 651 F.2d 877, 884 (3d Cir. 1981)

---

[25] Again, we do not suggest that our appellate review extends to ensure that a district court's reasons are sufficiently compelling, as the Supreme Court appeared to be describing only a district court's own duty to "ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597. We nonetheless note this nuanced distinction because we believe our appellate approach post-*Gall*, as outlined in this opinion, is rather modest when compared to what some of our sister circuits have held. The Fourth Circuit knew well that *Gall* had invalidated the "proportionality principle," so it must have believed its test to conform with *Gall*. In this case, even when we do not test the District Court's degree of variance against "compelling" justifications, we still find an abuse of discretion.

75

(quoting R. Dworkin, *Taking Rights Seriously* 31 (1977)).

3.

Finally, we provide some commentary to highlight the differences between *Gall* and this case. Brian Gall was convicted of conspiracy to distribute ecstasy while a second-year college student at the University of Iowa. Notably, within six months of joining the conspiracy, Gall withdrew therefrom and stopped selling illegal drugs of any kind at that time. Upon graduation, Gall obtained employment earning $18 per hour as a master carpenter. The district court stated that Gall "self-rehabilitated" and sentenced him to probation for a term of 36 months. The court of appeals vacated the sentence as unreasonable.

The Supreme Court, in reversing the court of appeals, stated that "[t]he Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms." 128 S. Ct. at 599. No such offset is present here, as Tomko was the head or lead offender and beneficiary of his offense. Deterrence and respect for the law are greatly reduced here by the District Court's probationary sentence in a way entirely absent from *Gall*. Gall was different from the other offenders in his conspiracy specifically and from other drug offenders generally. Specifically, Gall withdrew

76

from the ecstasy distribution conspiracy; generally, he rehabilitated himself in a way that made him an outlier. By contrast, Tomko's employment history not only failed to differentiate him, but it also served as the very vehicle he utilized to manipulate his taxes and commit his offense.

This contrast also explains how Gall's disparity from other drug distribution conspirators appropriately resulted in a disparity in his sentence in that case, whereas the absence of disparity between Tomko and typical tax evaders should not have resulted in a sentencing disparity of the magnitude we face here. The Supreme Court emphasized "the critical relevance of Gall's voluntary withdrawal, a circumstance that distinguished his conduct not only from that of all his codefendants, but from the vast majority of defendants convicted of conspiracy in federal court." *Id.* at 600. No such distinguishing circumstance is present here to separate Tomko from the vast majority of defendants convicted of tax evasion. Also, "[g]iven the dramatic contrast between Gall's behavior before he joined the conspiracy and his conduct after withdrawing, it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future." *Id.* at 601. Without imposing any categorical rules about age, we believe it is clear from the record in our case that Tomko's turn to charitable work can hardly be characterized as a turn toward maturity and away from impetuousness. Thus, the mitigating

77

factors which supported Gall's sentence and made it reasonable under the totality of the circumstances are absent in Tomko's case.

IV.

In addition to rendering the Guidelines advisory, the Supreme Court's decision in *Booker* undoubtedly gave courts of appeals a new role of ascertaining whether sentences are reasonable. Contrary to the suggestion of the Majority, when we are faced with a substantively unreasonable sentence, our hands are not tied and we need not resign ourselves to a sentencing regime which tolerates unwarranted disparities. *See* Majority Op. at Part IV. The Supreme Court in *Booker* did not sanction a return to the unfettered sentencing discretion districts courts enjoyed during the pre-Sentencing Reform Act era. Rather, in *Booker*, the Court recognized Congress's goal of achieving "greater uniformity in sentencing" and was confident that courts of appeals would be able to "iron out sentencing differences" through reasonableness review. 543 U.S. at 255, 263. Because neither Congress nor the Supreme Court has abandoned the goal of uniformity in sentencing, neither should we. Rather than invite Congress to impose a system of mandatory sentences, we endeavor to fulfill our limited but important role of reviewing sentences for reasonableness.

Although in *Gall* the Supreme Court reiterated that we apply an abuse-of-discretion standard to reviewing the

78

reasonableness of a sentence, in this same decision the Court clarified that appellate courts must consider both procedural and substantive reasonableness. Accordingly, if substantive reasonableness review is to mean anything, courts of appeals must attempt to give content to this component of our review until the Supreme Court provides further guidance. Having reviewed, with due deference, the District Court's stated justifications for granting a significant variance from the Guidelines range, we cannot conclude that the sentence imposed in this case was substantively reasonable in light of the "totality of the circumstances" and the "§ 3553(a) factors, on a whole." *Gall*, 128 S. Ct. at 597. *Gall*'s instruction to review sentences for substantive reasonableness gives us the authority to vacate such sentences. Congress, the Sentencing Commission, and the public rely on us to exercise that authority. Therefore, we would vacate the judgment of the District Court and remand for resentencing in accordance with this opinion.